Case 1:18-cv-11884-WGY Document 1 Filed 08/31/18 Page 1 of 45

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| HAROLD B. MURPHY, CHAPTER 11 TRUSTEE OF NEW ENGLAND CONFECTIONERY COMPANY, INC., <br><br> **Plaintiff,** <br><br> v. <br><br> ACAS, LLC, ARES CAPITAL CORPORATION, ARES MANAGEMENT LLC, ARES MANAGEMENT L.P., ARES CAPITAL MANAGEMENT LLC, MICHAEL MCGEE, MYUNG YI, ANUJ KHANNA, GORDON O'BRIEN, STEPHEN CHEHI, DANIEL KATZ, DOUGLAS WEEKES, AND DAVID EATON, <br><br> **Defendants.** | No. _____ |

## COMPLAINT

For his Complaint against the above-named Defendants, Plaintiff Harold B. Murphy, the

Chapter 11 Trustee of New England Confectionery Company, Inc. ("**NECCO Candy**"), by his

attorneys, alleges as follows:

### I. INTRODUCTION

Founded in 1847, NECCO Candy's predecessor ("**Old NECCO**") was the oldest candy

company in the United States. Its flagship products, including Sweethearts, NECCO wafers,

Mary Jane, Canada Mints, and Sky Bar, were manufactured in an 825,000 square foot facility

owned by the company and located in Revere, Massachusetts. In December 2007, Old NECCO

was acquired by Defendant ACAS, LLC, ("**ACAS**") for approximately $57 million, in a highly-

Case 1:18-cv-11884-WGY Document 1 Filed 08/31/18 Page 2 of 45

leveraged transaction (LBO). As part of the acquisition structure, ACAS severed the real estate interests of Old NECCO from the rest of the assets, placing the properties in separate real estate companies and granting mortgages to ACAS to secure a portion of the purchase price, with the balance of the debt placed directly on NECCO Candy. Despite this ostensible debt allocation, all of the responsibility for servicing the real estate and corporate debt was foisted on NECCO Candy and depended on NECCO Candy's ability to become profitable – a dubious proposition given Old NECCO's legacy of losses. After the closing, ACAS stacked the NECCO Candy Board of Directors and governing bodies of the real estate companies with its own employees and proceeded to pile up losses of approximately $150,000,000 over the next decade under its ownership and direction. Undeterred by these losses and NECCO Candy's inability to service its debt, ACAS proceeded to extract nearly $50,000,000 for itself from NECCO Candy through interest, principal, fees and rent, with approximately $30,000,000 of that amount being paid within sixteen months of Closing.

On May 23, 2016, Defendant Ares Capital Corporation entered into a merger agreement with ACAS under which Ares agreed to purchase ACAS and its portfolio companies, including NECCO Candy and its affiliated real estate companies, for approximately $3.4 billion. The plan of merger required that all major decisions at ACAS's portfolio companies be approved by Ares. As events unfolded, this delegation of approval rights and subsequent assumption of ACAS's various positions in NECCO Candy and the real estate by Ares proved disastrous for NECCO Candy.

On July 5, 2016, Miles Arnone, a former ACAS employee, long-time operations consultant to NECCO Candy and NECCO Candy Director, through his newly-formed private equity company Cannon Capital, LP, made an offer to purchase the equity of NECCO Candy and

the related real estate companies for $35 million. The offer was higher than any recent valuation that ACAS or Ares had received or prepared for NECCO Candy and the real estate. Cannon's offer contemplated funding by Atlantic Management Corporation, a local real estate firm, and the assumption of all of NECCO Candy's debts other than its obligations to ACAS. Based on the compelling terms of Cannon's offer, ACAS and Ares authorized management to commence diligence with Cannon, under the ultimate guidance and supervision of ACAS and Ares.

While the discussions were ongoing, in the fall of 2016, ACAS and Ares learned that Cannon had agreed to fund the transaction through a sale of the real estate to Atlantic, with $22,000,000 of the purchase price being allocated to relocate NECCO Candy to more economical and efficient space, pay back taxes and pension liabilities, and infuse the company with its required working capital. Rather than viewing the Cannon transaction as a "win-win" that would have enabled NECCO Candy to survive as a going concern, the NECCO Candy Board of Directors, under the direction, control and domination of ACAS and Ares, allowed Ares to assume complete control of the negotiations and sabotage the proposed Cannon transaction in pursuit of "more proceeds for Ares." Simply put, the hopelessly-conflicted NECCO Candy Board consciously disregarded its legal obligations to NECCO Candy, in favor of accommodating Ares's interest in siphoning as much money as possible away from NECCO Candy. Indeed, at all times relevant to this case, the NECCO Candy Board of Directors was controlled by individuals who were simultaneously employees of ACAS or Ares, which entities were both the lender to and owner of NECCO Candy and the associated real estate.

After formally assuming control of the NECCO Candy Board in January 2017, Ares continued to muscle Cannon and NECCO Candy out of the deal and pursue a transaction for the real estate alone directly with Atlantic. However, there was a significant impediment to the deal:

NECCO Candy enjoyed occupancy rights under a long-term lease for the Revere facility running through the year 2022. NECCO Candy had not paid rent for at least six years, as it was acknowledged and agreed by ACAS that NECCO could not and would not be required to pay rent for the foreseeable future. Ares solved that obstacle by (i) causing the NECCO Candy Board to approve a termination of the lease, (ii) instructing NECCO Candy's CEO (and Director) to terminate the lease for no consideration and without an evaluation of the fairness or legality of the transaction, (iii) requiring NECCO Candy to sign a short-term lease with Atlantic under terms that the Board of Directors knew NECCO Candy could not perform, (iv) imposing upon NECCO Candy the obligation to restore the premises, and (v) positioning NECCO Candy for a liquidation. The NECCO Candy Board then rewarded the CEO/Board member/Realty manager who effected the lease transactions with an $826,861 "incentive" payment through an adjustment in NECCO Candy's benefit plan. On April 24, 2017, Ares pocketed the approximate $54,000,000 paid by Atlantic (less closing costs and the funds used to buy-off Cannon). NECCO Candy did not receive a penny of the Atlantic proceeds; even its request to Ares for a commitment to support its new lease obligations to Atlantic was summarily rejected.

Having scuttled the Cannon equity transaction, terminated NECCO Candy's legacy leasehold interest in the Revere facility and imposed a rent obligation on NECCO Candy for the first time in years, the Ares-controlled Board ensured NECCO Candy's liquidation. Rather than immediately proceeding to an orderly sale and wind-down of NECCO Candy to avoid further diminution in the value of NECCO Candy's assets and an increase in its liabilities to creditors, Ares/ACAS and the Board delayed the sale process so as to distance themselves from the Atlantic real estate transaction and render ACAS's otherwise avoidable lien on NECCO Candy's assets unavoidable. During this time, the value of NECCO Candy's assets plummeted and the

obligations to its legitimate creditors dramatically increased. Once the avoidance period expired on February 22, 2018, the Board selected Gordon Brothers to liquidate the company. In order to push through a sale of NECCO Candy's assets to the liquidation firm, and to avoid scrutiny of the NECCO Board and ACAS/Ares's misconduct and suspect debt, Ares caused a verified complaint to be filed by the debt holder (ACAS) against NECCO Candy claiming that ACAS was owed over $100,000,000 and seeking the immediate appointment of a receiver. Not only was the NECCO Candy Board complicit in the filing of the receivership complaint, it actually consented to the appointment of receiver to effectuate the liquidation. The contrived receivership failed when trade creditors intervened and revealed that ACAS had not disclosed to the Court that it was the owner of NECCO Candy and in complete control of its governance and operations. Once these conveniently omitted facts emerged, the Court rejected the sham receivership, noting that ACAS was requesting relief "to aid in maximizing the value of NECCO's assets for its own benefit, rather than to benefit any other creditor or stakeholder in NECCO."

By this action, the Trustee seeks redress for the substantial damages inflicted upon NECCO Candy and creditors by its multi-conflicted Board of Directors, aided and abetted by ACAS and Ares. As detailed below, the Director Defendants deliberately and flagrantly breached their fiduciary duties to NECCO Candy by, among other things, (i) abdicating crucial decisions to the equity sponsors, with full knowledge that such decisions were not in the best interest of NECCO Candy or its creditors; (ii) subjugating the interests of NECCO Candy to the desires of ACAS and Ares to decouple and monetize their real estate interests; (iii) failing to give proper consideration to the Cannon deal, or negotiate for a transaction that would have enabled NECCO Candy to continue as a going concern; (iv) terminating NECCO Candy's lease for no

consideration and without requesting or receiving opinions on the fairness of any aspect of the transaction as to NECCO Candy; (v) foisting a new, financially untenable short-term lease on NECCO Candy; and (vi) delaying the liquidation of NECCO Candy's assets and allowing the value of its assets to be severely diminished and the amount of its liabilities to dramatically increase – all in furtherance of a scheme to avoid scrutiny of their misconduct and the suspect debt positions of NECCO Candy's owners.

## II.   JURISDICTION AND VENUE

1.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1334(b) because this civil proceeding arises in or is related to a Chapter 11 bankruptcy case.

2.   Defendants are each subject to personal jurisdiction in this District because they served as directors, officers, lenders, and/or owners of NECCO Candy, which operated in Massachusetts, and owned real property in Massachusetts.  Defendants also caused injury to NECCO Candy in Massachusetts through acts and conduct that occurred in Massachusetts.

3.   Venue is proper within this District pursuant to 28 U.S.C. §§ 1391(b), 1409.

## III.   PARTIES AND RELEVANT NON-PARTIES

4.   Plaintiff, Harold B. Murphy (the "**Trustee**"), is the duly appointed and acting Chapter 11 Trustee of New England Confectionery Company, Inc. ("**NECCO Candy**").

5.   Upon information and belief, Defendant ACAS, LLC, f/k/a American Capital, Ltd., is a limited liability company organized under the laws of the State of Delaware ("**ACAS**").

6.   Upon information and belief, Defendant Ares Capital Corporation ("**ARCC**") is a corporation organized under the laws of the State of Maryland.

7.   Upon information and belief, Defendant Ares Management LLC is a limited liability company organized under the laws of the State of Delaware.

8.     Upon information and belief, Defendant Ares Management L.P. is a limited partnership organized under the laws of the State of Delaware.

9.     Upon information and belief, Defendant Ares Capital Management LLC is a limited liability company organized under the laws of the State of Delaware.

10.     The Ares entities named in paragraphs 6-9 above are collectively referred to herein as "**Ares**" unless otherwise indicated.

11.     Chapter 11 Debtor NECCO Candy is a corporation organized under the laws of the State of Delaware.  NECCO Candy was formed by ACAS in 2007 to acquire the operating assets of a former Massachusetts company also named New England Confectionery Company, Inc. ("**Old NECCO**").

12.     NECCO Holdings Inc. is a corporation organized under the laws of the State of Delaware ("**NECCO Holdings**").  NECCO Holdings was established by ACAS in 2007 as part of ACAS's acquisition of the assets of Old NECCO.  NECCO Holdings is the parent company of NECCO Candy.

13.     NECCO Realty Investments LLC is a limited liability company organized under the laws of the State of Delaware ("**NECCO Realty**").  NECCO Realty was established by ACAS in 2007 to hold the interests of five subsidiary limited liability companies formed by ACAS to accept record title to the various parcels of real estate conveyed by Old NECCO.

14.     Upon information and belief, Defendant Michael McGee ("**McGee**") is an individual residing in the State of New York.  McGee was the CEO of NECCO Candy from 2014 through April 2018.  McGee also served on the NECCO Candy Board of Directors from January 2016 through at least April 2018.

7

15. Upon information and belief, Thomas Barnes ("**Barnes**") is an individual residing in the State of Florida. Barnes was the CFO of NECCO Candy from April 2012 through April 2018. Barnes was also a former employee of ACAS, who performed services for NECCO Candy under the direction and control of ACAS.

16. Upon information and belief, Defendant Myung Yi ("**Yi**") is an individual residing in Derwood, Maryland. Yi was employed by ACAS from 2000 to 2017. Yi was a managing director in ACAS's "Special Situations Group" which sourced the NECCO deal and was assigned to manage NECCO Candy as one of ACAS's portfolio companies. Yi also served on the NECCO Candy Board of Directors from November 2007 to January 2017.

17. Upon information and belief, Defendant Anuj Khanna ("**Khanna**") is an individual residing in the State of Maryland. Khanna was an employee of ACAS and served on the NECCO Candy Board of Directors from July 2016 to January 2017.

18. Upon information and belief, Defendant Gordon O'Brien ("**O'Brien**") is an individual residing in the Commonwealth of Massachusetts. O'Brien was a managing director of ACAS and served on the NECCO Candy Board of Directors from January 2016 to January 2017.

19. Upon information and belief, Defendant Stephen Chehi ("**Chehi**") is an individual residing in Brooklyn, New York. Chehi has been an employee of Ares since 2014. Chehi was assigned to conduct due diligence on NECCO Candy and NECCO Realty as two of the portfolio companies that Ares would inherit when it merged with ACAS. Chehi also served on the NECCO Candy Board of Directors from January 2017 through at least April 2018.

20. Upon information and belief, Defendant Daniel Katz ("**Katz**") is an individual residing in the State of New York. Katz is employed by Ares as a "Partner." Upon information and belief, Katz was the leader of the Ares team that was assigned to manage NECCO Candy

8

and NECCO Realty after the merger with ACAS. Katz also served on the NECCO Candy Board of Directors from January 2017 through at least April 2018.

21.     Upon information and belief, Defendant Douglas Weekes ("**Weekes**") is an individual residing in the State of California. Weekes served on the NECCO Candy Board of Directors from January 2016 through at least April 2018.

22.     Upon information and belief, Defendant David Eaton ("**Eaton**") is an individual residing in the State of Illinois. Eaton served on the NECCO Candy Board of Directors from November 2017 through at least April 2018.

**IV.    STATEMENT OF FACTS**

New England Confectionary Company

23.     Old NECCO was founded in 1847, and was the oldest multi-line manufacturer, marketer and distributor of confectionery products in the United States. It was formally incorporated in 1901.

24.     Old NECCO manufactured and distributed many well-recognized brands of candy, including Sweethearts Conversations Hearts, NECCO Wafers, Clark Bar, Mary Jane, Haviland Thin Mints, and Mighty Malted Milk Balls.

25.     Since 1963, Old NECCO had been a wholly-owned subsidiary of United Industrial Syndicate, Inc. ("**UIS, Inc**."), an operating trust formed by the late Harry Lebensfeld.

26.     Through several acquisitions between 1979 and 1999, Old NECCO expanded its geographic footprint and customer base within the United States and built a product portfolio across a broad spectrum of chocolate and non-chocolate candy products.

27.     In 2003, Old NECCO consolidated its three Boston area locations into a newly-constructed, state-of-the-art confectionary production and warehousing facility located at 135

9

Case 1:18-cv-11884-WGY   Document 1   Filed 08/31/18   Page 10 of 45

American Legion Highway in Revere, Massachusetts (the "**NECCO Real Estate**").  The

NECCO Real Estate included office, warehousing and manufacturing space, totaling

approximately 825,000 square feet. The facility was specifically outfitted for the requirements of

Old NECCO.

28.     Located adjacent to the Old NECCO production facility is a co-generation and

central services plant (the "**Cogen Facility**"), which has been processing natural gas to provide

NECCO with up to 6MW of electricity  and essential central services, such as chilled water, hot

water steam and compressed air since April 2004.

29.     During 2005 and 2006, Old NECCO sustained losses in excess of $16,000,000.

ACAS's 2007 Leveraged Buy-Out of NECCO

30.     On December 21, 2007 (the "**Closing Date**"), ACAS, a publicly-traded

alternative asset management company, partnered with Old NECCO's CEO  Domenic Antonellis

("**Antonellis**") and Clear Creek Capital ("**Clear Creek**" and together with Antonellis, the

"**Investors**"), to purchase substantially all of the operating and real estate assets of Old NECCO

and the Cogen Facility for approximately $57,000,000 (the "**NECCO Buyout**").

31.     The terms of the NECCO Buyout were governed by an Asset Purchase

Agreement dated November 31, 2007 (the "**APA**").

32.     The NECCO Buyout was orchestrated by ACAS's Special Situations Group (the

"**ACAS Deal Team**"), under the direction of Defendant Yi and subject to the oversight and

approval of ACAS's Investments Committee (the "**IC**"). The Special Situations Group targeted

distressed companies, turnaround opportunities and other complex investments.

33.     ACAS incorporated NECCO Candy, and its parent, NECCO Holdings, for the

purpose of acquiring all of the confectionary and operational assets of Old NECCO, which

included raw materials, inventory, accounts receivable, machinery and equipment, and intellectual property.

34. ACAS created NECCO Realty and five subsidiary real estate-related LLCs to acquire all of Old NECCO's real property assets, which included a manufacturing facility in Pewaukee, Wisconsin, a warehouse in Thibodeaux, Louisiana, and the main production facility in Revere, Massachusetts. (The Wisconsin and Louisiana properties were sold shortly after the Closing Date.)

35. On the Closing Date, in payment of the cash purchase price under the APA, ACAS wired $29,396,717.11 to UIS, Inc. and another $9,000,000 to an escrow account pending the outcome of certain contingent litigation liability not assumed by the buyer under the APA. ACAS also wired $10,509,608.70 directly to NECCO Candy, only $500,000 of which NECCO Candy retained on its books as cash, and $10,000,000 of which it used to fund the purchase of the Cogen Facility. There was little or no equity put into NECCO Candy.

36. The NECCO Buyout required NECCO Candy to pay in excess of $5,000,000 in fees to ACAS.

37. As part of the NECCO Buyout, NECCO Candy entered into a triple-net lease with NECCO Realty MA I, LLC, for its use of the NECCO Real Estate (the "**Lease**"). With extension, the term of the Lease ran until December 31, 2022. The Lease was designed such that the monthly rent would be equal to the amount necessary to service NECCO Realty's debt on the Term Loan B debt described below.

38. The secured debt commitments imposed on NECCO Candy and NECCO Realty in connection with the NECCO Buyout included:

11

a.  A Term Loan in the amount of $35,800,000, binding upon the NECCO Realty

Entities, and secured by first mortgages on the real estate ("**Term Loan B**").  The

Term Loan B facility carried a fixed rate of interest at 8% per annum, payable

monthly, and PIK Interest accruing monthly at a rate of 6%, payable at maturity.

Under the terms of the facility, years one and two of a ten-year term require

interest-only payments, with 30-year amortization schedule commencing in year

three, with amortization of 3.3% per annum during years 3-9 with the balance due

at maturity.

b.  A Term Loan in the amount of $6,800,000, binding upon NECCO Holdings and

NECCO Candy as co-borrowers, and secured by a first lien on NECCO Candy's

assets and NECCO Holdings' equity interest in NECCO Candy ("**Term Loan**

**A**").  The facility carried a variable interest rate of 1-month LIBOR + 4.5% per

annum, payable monthly and convertible to Prime + 3.5% upon irrevocable

written notice.  Under the terms of the facility, years one and two of a five-year

term require interest-only payments, with a five-year amortization schedule

beginning in year three, with amortization of 20% due in years three and four,

with the balance due at maturity.

c.  A Revolving Credit Facility (the "**ACAS Revolver**" and with Term Loan A, the

"**Debt Facilities**") with a commitment of up to $23,200,000, cross-collateralized

with the Term Loan A facility on a *pari passu* basis.  Approximately $8,800,000

million was drawn down on the Closing Date to fund the expenses of the LBO.

The term of the facility was five years, and it carried a variable interest rate of 1-

12

month LIBOR + 4.5% per annum, convertible to prime + 3.5% upon irrevocable written notice.

39. Through NECCO Candy Investments, LLC, ACAS held an approximate 70% ownership interest in NECCO Holdings, held as Class A common stock, with voting rights. Clear Creek held an approximate 6% ownership interest in NECCO Holdings, held as Class B non-voting common stock. Antonellis held an approximate 16% interest in NECCO Holdings, held as Class B non-voting stock, with additional, fully-vested Class B options. An approximate 8% ownership interest in NECCO Holdings, in the form of Class B common stock, was reserved for issuance to employees under the NECCO Long-Term Incentive Plan.

40. The initial membership of the NECCO Holdings Board of Directors was identical to that of the NECCO Candy Board of Directors, and included two ACAS employees in the Special Situations Group - Yi and Jeff Anapolsky. Antonellis was the third member of these boards.

41. ACAS held 70% of the membership interests in NECCO Realty as preferred membership interests, which, it purchased at a cost of $4,923,913. NECCO Realty then used $4,900,000 of that allocation to purchase 20,000 Class A preferred shares in NECCO Holdings, which accrued dividends quarterly at 10%, whether or not declared, and to compound if unpaid. These shares were redeemable by NECCO Realty at $1000 per share, upon notice. Clear Creek and Antonellis held 10% and 20% of Realty, respectively, which interests carried no voting rights, and were regarded as profit interests.

Case 1:18-cv-11884-WGY   Document 1   Filed 08/31/18   Page 14 of 45

ACAS Seeks Cash-Out Debt Refinancing

42.    Immediately after the Closing Date, the ACAS Deal Team began working with their colleagues in the ACAS Syndications department to refinance the ACAS Revolver and the Term Loan A debt.

43.    Between the Closing Date and April 30, 2008, NECCO Candy's fiscal year end, NECCO Candy paid ACAS $277,206 in interest under the Debt Facilities, and $100,000 to an ACAS affiliate in "consulting fees" for operations personnel.  By the end of the stub period ending April 30, 2008, although NECCO Candy recorded a net loss of $5,165,797, ACAS caused NECCO Candy to repay $1,800,000 of the outstanding principal amount of its Term Loan A debt and the entire $8,800,000 balance of the ACAS Revolver.  During that same period, NECCO Candy paid a total of $1,189,000 in rent to NECCO Realty to be funneled back to ACAS.

44.    By May of 2008, NECCO Candy and NECCO Realty each had accumulated numerous affirmative reporting defaults under the Debt Facilities.

45.    Having entered into confidentiality agreements with and distributed its syndication book to numerous potential lenders in April 2008, the Deal Team received only three proposals to refinance the ACAS Revolver and none for the Term Loan A.  The proposals came from TD Bank, Wells Fargo/Foothill, and Core Business Credit, LP (with its affiliated entities, "**CORE**"). CORE was a portfolio company owned and controlled by ACAS.

46.    CORE's initial proposal to refinance the ACAS Revolver was sent to ACAS on June 17, 2008.  ACAS Syndications immediately characterized it as "significantly less competitive" than the other two proposal received because it included a three-year loan term, a five-year amortization schedule repaid over three years at ($83,000 per month), a commitment

14

fee of 1.5% in addition to the 0.5% unused line fee, a prepayment penalty through year 3, a $2500 monthly collateral management fee, a full suite of financial covenants, weekly borrowing base certificates, quarterly field exams, and a $50,000 expense deposit in the event the deal did not close.

47.     While ACAS Syndications favored pursuing the offers from other lenders, Yi believed that the other lenders might back out "given the situation" at NECCO Candy. He considered CORE the only certain option.

48.     The refinancing transaction with CORE (the "**CORE Refinancing**") closed on August 8, 2008, when NECCO Candy, as borrower, entered into a Loan and Security Agreement with CORE.

49.     The term of the new revolving credit facility (the "**CORE Revolver**") was five years, and included a commitment to lend up to $19,200,000, with an interest rate of Prime + 1.5% (about 6.5%) and an unused line fee of 0.375%.

50.     Security for the CORE Revolver consisted of a guarantee from NECCO Holdings, and a first lien on substantially all of the assets of both NECCO Holdings and NECCO Candy.

51.     Simultaneously with the CORE Refinancing, ACAS was required to increase the principal amount of the Term Loan A from $5,000,000 to $9,000,000, and simultaneously reduce the amount outstanding under the ACAS Revolver by $4,000,000. This maneuver was considered a "recharacterization," the net effect of which would be "to return $2.0 million of capital to ACAS," and "relieve ACAS of significant future funding obligations." While the Term Loan A interest rate remained unchanged, a 7% incremental PIK interest rate was to apply retroactive to August 8, 2008, in the event that the Term Loan A were not refinanced within 120 days.

Case 1:18-cv-11884-WGY  Document 1  Filed 08/31/18  Page 16 of 45

52.     On December 5, 2008, the Term Loan A and CORE Revolver facilities were amended (Term Loan A for the second time, the CORE Revolver for the first time), to increase the CORE commitment to lend under the CORE Revolver to $25,000,000 (an increase of $5,800,000) to complete what the ACAS Deal Team dubbed "Phase II" of the CORE Refinancing.  This amendment ultimately allowed NECCO Candy to prepay $5,000,000 of the outstanding principal amount of the Term Loan A debt, adding the 7% incremental PIK interest to the facility.  In order to complete Phase II, CORE required revisions to certain of its financial covenants, including the Borrowing Base formula.

ACAS is Forced to Repurchase the CORE Revolver

53.     For FY 2010, NECCO Candy reported a loss of approximately $15.2 million and faced serious liquidity issues.

54.     By April 2010, CORE was refusing to over-advance on the CORE Revolver without additional collateral and unobstructed rights to go after such collateral.

55.     As a result, the ACAS Deal Team requested additional funds from ACAS in the form of $5.5 million of second lien debt.  This second lien debt would be priced at more than 18% per annum. The ACAS Deal Team also requested that ACAS's management fees be accrued (rather than paid) for a full year.

56.     In Q4 2010, ACAS was forced to repurchase the outstanding balance on the CORE Revolver and reassumed control of the entire $25,000,000 facility.  Upon information and belief, ACAS repurchased the CORE Revolver in order to facilitate the sale of CORE Business Credit to NewStar Business Financial which refused to assume the CORE Revolver in its then current state.

16

ACAS Searches for a Buyer for NECCO Candy and NECCO Realty

57.     In July 2010, in the midst of NECCO Candy again reporting horrific losses, exhausting the availability on the Core Revolver and falling further behind on payments to suppliers, the ACAS Deal Team explored two options for the business: (1) new funding of approximately $7,500,000 from ACAS (additional second lien debt) to bridge to a sale after the 2011 Valentine's season, or (2) a sale of NECCO Candy and NECCO Realty.

58.     ACAS concluded that the first option was more beneficial to ACAS because it did not wish to be left with a vacant, single purpose building with the responsibility to subsidize maintenance, taxes, utilities, and the ultimate restoration of the premises for another use. Accordingly, the ACAS Deal Team requested that NECCO Candy be permitted to discontinue cash interest payments to ACAS, and stop or scale back rent payments to NECCO Realty (used to service the principal and interest on Term Loan B).

59.     On or about October 26, 2010, NECCO Candy engaged Sawaya Segalas & Co. LLC ("**Sawaya**") to pursue a potential sale of NECCO Candy and NECCO Realty, in whole or in part, and with or without the real estate.

60.     On or about December 2010, Sawaya on behalf of NECCO delivered a Confidential Information Memorandum to potential buyers. The target closing date for the sale was March 2011.

61.     By February 2011, Sawaya received offers from five potential strategic buyers for NECCO Candy indicating a valuation range from $20-30 million.  None of the buyers expressed an interest in buying all of NECCO Candy or the real estate; rather, they expressed interest only in certain of NECCO Candy's sugar and/or chocolate brands. When it became clear that were no

17

potential acquirers for the real estate and that no party would take responsibility for restoring the premises for another use, ACAS abandoned the sale process.

ACAS Incentivizes NECCO Candy to Focus on the Real Estate

62.     On March 19, 2012, the NECCO Candy Board of Directors held a board meeting during which Barnes introduced a new "2012 Executive Incentive Complementation Plan" (also referred to as the "SAR" plan), to replace the employee stock option plan then currently in place. The 2012 Executive Incentive Complementation Plan incorporated the value of ACAS's "primary asset" - the NECCO Real Estate - into NECCO Candy's employee incentive compensation which had previously been limited to appreciation in NECCO Candy's value.

63.     On May 31, 2012, the NECCO Holdings Board of Directors voted unanimously to adopt the 2012 Executive Incentive Compensation Plan ("**2012 SAR Plan**").

64.     Under the terms of the 2012 SAR Plan, Units could only be exercised upon a "Triggering Change of Control," meaning "the later to occur of a Corporation Change in Control and a NECCO Realty Change in Control." In other words, no monies were payable to plan beneficiaries until *both* NECCO Candy and NECCO Realty were sold for a premium above stated values in ACAS's published financials.

65.     At the same time, ACAS never made the required investment in NECCO Candy to stabilize and improve sales.  Rather, it continued to keep NECCO Candy on life support while it maintained NECCO Realty and attempted to capitalize on the value of the real estate.

66.     As a result, NECCO Candy's losses accelerated in subsequent years.  Between May 2011 and April 2016, NECCO Candy lost approximately $75,675,000 culminating with annual losses of $17,685,000 and $20,360,000 in fiscal years 2015 and 2016, respectively.

18

67.     The company's liabilities grew with its losses.  In fiscal years 2012 through 2016, the ACAS Revolver balance increased from approximately $8,451,000 to $15,178,000 and NECCO Candy ran-up its aggregate non-insider debt from approximately $3,100,000 to $13,100,000.

### ARCC/ACAS Merger Discussions

68.     By early 2016, ARCC and ACAS began negotiating a merger of the two publically-traded companies.

69.     Under the Agreement and Plan of Merger, dated May 23, 2016, ACAS was required to seek ARCC's approval before taking any significant actions in connection with NECCO Candy and NECCO Realty pending the consummation of the ACAS/ARCC merger.

70.     In or about March 2016, Ares began conducting due diligence on NECCO Candy and NECCO Realty.   The Ares Deal Team for NECCO Candy was comprised of Katz, Phil LeRoy and Chehi; the Ares Deal Team for NECCO Realty was comprised of Katz, Phil LeRoy, Chehi, and Bojan Bajic.

71.     Ares's research confirmed that NECCO Candy was not viable as constituted, and that it had not paid rent to NECCO Realty since 2011 and was not expected to be able to pay contractual rent "for the foreseeable future."

72.     In May 2016, ACAS sought Ares's approval to provide NECCO with a $2,100,000 over-advance on the ACAS Revolver.  Chehi recommended that Ares commit the funds necessary to keep NECCO Candy afloat while it evaluated a longer-term plan, including a liquidation that could "unlock the value" of the NECCO Real Estate.

19

<u>Cannon Capital Offers to Purchase NECCO Candy and the NECCO Real Estate</u>

73.     On July 6, 2016, Miles Arnone, a former member of the operations team at ACAS, a longtime NECCO Candy consultant and a NECCO Candy Director, delivered a Letter of Intent to purchase NECCO Holdings and NECCO Realty on behalf of his newly-formed company, Cannon Capital, LP ("**Cannon**"), for $35,000,000. The purchase price was to be funded by Atlantic Management Corporation ("**Atlantic**"), a local real estate firm. The proposed purchase price was higher than any recent valuation prepared or received by ACAS/Ares for NECCO Candy and the NECCO Real Estate. Specifically, according to Ares, Cannon's offer was 7% higher than ACAS's most recent fair value estimate and 18% higher than Ares's.

74.      Chehi and Katz recommended that ACAS be permitted to pursue the Cannon deal "under our supervision" because of the premium to Ares's "mark," it eliminated the time and effort likely required to achieve an uncertain return through alternative paths, and it provided the benefit of selling all of the NECCO entities in a single transaction. Ares/ACAS, Cannon and Atlantic (through Cannon) proceeded with due diligence and negotiations of a deal.

75.     By October 2016, Ares/ACAS, Cannon and Atlantic (through Cannon) had reached agreement on material terms of a sale to Cannon, including assurance that if Cannon "flipped" the purchased assets, Ares/ACAS would receive additional monies.

<u>Ares Sabotages the Cannon Deal</u>

76.     In or about November of 2016, as the Cannon deal neared closing, Ares and ACAS learned that Cannon had agreed to fund the transaction through a sale of the real estate to Atlantic, with $22,000,000 of the purchase price (incremental to the $35,000,000 to be paid to ACAS) allocated to relocate NECCO Candy to more efficient space, pay back taxes and pension liabilities, and infuse the company with necessary working capital.

77.     Upon information and belief, Atlantic had previously offered Cannon $10,000,000 to simply liquidate NECCO Candy, but Cannon rejected this option because its investment thesis is "reviving and growing companies" and "shutting down [its] first acquisition would destroy the firm."  Cannon told Atlantic that a shutdown of NECCO Candy was "non-negotiable."

78.     Rather than viewing the Cannon/Atlantic transaction as the right outcome for both NECCO Candy and NECCO Realty, Ares saw an opportunity to divert all of the value from the transaction to itself and to the exclusion of NECCO Candy.

79.     Without even acknowledging the obvious conflict of interest, Ares instructed NECCO Candy Directors Khanna and Yi (also ACAS employees and managers of NECCO Realty) to renegotiate the Cannon Deal to extract "more proceeds" for Ares.

80.     In late 2016, Cannon made various revised offers to Ares/ACAS that would have avoided "shuttering" NECCO Candy and enabled NECCO Candy to relocate its operations. Cannon proposed to share a portion of the Atlantic relocation proceeds and close a transaction that would have yielded a premium value to Ares. Nevertheless, Ares/ACAS rejected these proposals, insisting instead on expropriating *all* of the proceeds for itself from the Atlantic transaction.

81.     As Ares squeezed for more money, the Cannon deal began to crumble, and NECCO Candy lost the opportunity to continue as a going concern.

Ares Assumes Formal Control of the NECCO Candy and NECCO Realty Boards

82.     On January 1, 2017, Katz (of Ares), Chehi (of Ares), McGee, and Weekes were appointed Managers of NECCO Realty (and all former ACAS managers were removed).

21

83.     Also on January 1, 2017, McGee, Katz (of Ares), Chehi (of Ares), and Weekes were appointed as Directors of NECCO Candy (and all former ACAS Directors were removed).

84.     As of January 1, 2017, by inserting its own people onto the NECCO Candy and NECCO Realty Boards, Ares dominated and controlled NECCO Candy and NECCO Realty.

85.     On January 3, 2017, the ARCC/ACAS merger formally closed.

86.     On March 13, 2017, by written consent of the ACAS Members of NECCO Realty, Weekes was removed as a Manager of NECCO Realty; the rest of the Managers remained:  Katz (of Ares), Chehi (of Ares) and McGee.

<u>Ares/ACAS Usurps the Atlantic Transaction</u>

87.     By December 2016, Ares/ACAS had developed a scheme to circumvent Cannon, pursue a sale of the real estate directly with Atlantic and push NECCO into liquidation.

88.     The new deal negotiated by Ares/ACAS and Atlantic provided that Atlantic would purchase the NECCO Real Estate, NECCO Candy would terminate its Lease with NECCO Realty and NECCO Candy would enter into a new short-term lease with Atlantic that would require NECCO to pay rent and vacate and restore the property by August 31, 2018. Notably, this structure did not contemplate the purchase or relocation of NECCO Candy or any funds flowing to NECCO Candy to pay its debts or continue operations.  Instead, Ares/ACAS and the Board decided not to "explore options for NECCO Candy" until after the sale of the real estate was completed.

89.     In Q1 2017, the negotiations between Ares/ACAS and Atlantic provided that Atlantic would pay NECCO Realty $54,500,000, with approximately $4,300,000 being used to buy-off Cannon and convince it to abandon its interest in relocating NECCO Candy and continuing operations. Simultaneously, NECCO Candy would be required to relinquish its

existing Lease and enter into a short-term lease with Atlantic that would require NECCO Candy to pay $5,000,000 in rent and to vacate and restore the premises at the end of the term.

90.     In early April 2017, in connection with discussions relating to the real estate transaction and termination of the Lease, McGee expressed concerns to Ares over NECCO Candy's ability to pay rent if it were to enter into the new lease with Atlantic because NECCO had been unable to pay rent since 2011. Ares refused to provide any commitment to support NECCO Candy's rent obligation, and simply sent McGee signature pages to execute (in advance of the approval of the transaction by the NECCO Candy Board).  Ultimately, Ares issued an expressly non-binding letter on behalf of ACAS stating in part: "ACAS…..can advise you, based on the facts of which ACAS is currently aware, that it is the present intention of ACAS to negotiate in good faith regarding a financing arrangement pursuant to which ACAS would advance [NECCO] certain amounts, to be agreed upon between ACAS and [NECCO]…."

91.     Upon information and belief, the NECCO Candy Board did not request or receive any data on comparable rental rates, any analyses of the overall fairness of the Atlantic transaction as to NECCO Candy or any solvency opinions. NECCO Candy did not receive any consideration for relinquishing its Lease rights. NECCO Candy's Board also did not request or receive any opinions of counsel as to the legality of the proposed transactions with Atlantic. Although NECCO Candy was insolvent at this time, the hopelessly-conflicted Board was solely interested in generating "more proceeds" for Ares.

92.     On April 20, 2017, the NECCO Candy Board of Directors, consisting of McGee, Weekes, Katz, and Chehi, unanimously voted to terminate the Lease between NECCO Candy and NECCO Realty and enter into a new lease with Atlantic ("**New Lease**"). There appear to be no Board minutes associated with this vote.

23

Case 1:18-cv-11884-WGY - Document 1 - Filed 08/31/18 - Page 24 of 45

93.     The Termination of Memorandum of Lease, filed in the Suffolk County Registry of Deeds on April 25, 2017, was signed by McGee as *both* the CEO of NECCO Realty MA I LLC (Landlord) and the CEO of NECCO Candy (Tenant). McGee also signed the New Lease on behalf of NECCO Candy. Upon information and belief, McGee signed these documents upon instruction by Ares and its counsel, without exercising informed or independent judgment as an officer and director of NECCO Candy.

94.     On April 25, 2017, the sale of the real estate from NECCO Realty to Atlantic closed.  Atlantic paid approximately $54,500,000 (less expenses) to NECCO Realty for the NECCO Real Estate and NECCO Candy was forced to commit to the New Lease with Atlantic obligating it to pay rent ($2,500,000 million/year) for the first time in seven years. The New Lease also required NECCO Candy to vacate and restore the building by August 31, 2018 (the "**Atlantic Deal**").

95.     When the sale of the real estate closed, the ACAS Revolver balance was approximately $16,600,000; NECCO Candy's payables were approximately $8,700,000; and its receivables and inventory totaled approximately $23,600,000 (not including the value of its brands, machinery and equipment).

96.     In exchange for NECCO Candy vacating the building and removing its equipment and piping, Atlantic agreed to pay a $3,000,000 "Surrender Fee."  Chehi had previously observed that it would cost $6,000,000-$8,000,000 for NECCO Candy to dismantle and wind-down its operations.

97.     The Atlantic Deal enriched Ares by approximately $54,000,000, and left NECCO Candy in a dire position with no facility in which to operate its business, no funding for the

24

obligations under the New Lease, no funding for relocation, and no viable alternative but to liquidate. There is no record of the Board having vetted these consequences.

98.     As a reward to McGee for accommodating the Atlantic Deal, in November 2017, after consummating the sale of the NECCO Real Estate, the NECCO Candy/NECCO Holdings Directors voted to alter the provision of the 2012 SAR Plan that linked payments to the sale of both the real estate and NECCO Candy, and to allow Units to be paid out (in installments) *upon the sale of the real estate only* ("**Modified SAR Plan**").  Under the Modified SAR Plan, McGee received: (1) Modified Real Estate Incentive Payments ($248,058.30 on October 31, 2017, $245,058.30 on January 15, 2018, $165,372.20 on March 31, 2018 and $165,372.20 on June 30, 2018); (2) Candy Incentive Payments (when NECCO Candy sold); and (3) KEIP payments of $400,000. To date, McGee has received $1,226,861 under the Modified SAR Plan.

99.     The Modified SAR Plan was approved by the NECCO Candy/NECCO Holdings Board of Directors, which consisted of Katz, McGee, Chehi, and Weekes.

<u>Ares Cobbles Together a Liquidation Plan for NECCO</u>

100.     By the time of the real estate closing in April of 2017, Ares/ACAS knew that ACAS had allowed its security interest in the Term Loan A to lapse, because it filed a new all-asset UCC financing statement on February 22, 2017. Only after Ares/ACAS received the proceeds from the Atlantic Deal did Ares and the Board begin to address NECCO Candy's liquidation. Ares of course knew that NECCO Candy had to be liquidated because it could not afford rent or relocation costs, and would soon have no facility in which to manufacture its products.

101.     Upon information and belief, Ares/ACAS recognized that if NECCO Candy filed a bankruptcy petition prior to February 22, 2018 its secured creditor position as to the Term Loan

25

A was susceptible to avoidance. Ares/ACAS therefore did not commence a search for a

liquidation buyer until late September 2017.

102.    By early 2018, there were only four expressions of interest to purchase some or

all of NECCO Candy's assets, including one from the liquidation firm of Gordon Brothers.

103.    On or about February 28, 2018, and only after the expiration of the avoidance

period, the NECCO Candy Board unanimously agreed to proceed with the Gordon Brothers bid.

The Board at the time consisted of Katz, Chehi, Weekes, McGee, and David Eaton ("**Eaton**").

104.    The Gordon Brothers transaction contemplated that Gordon Brothers would

purchase NECCO Candy's assets for the stated purchase price of approximately $15,000,000

(later reduced to $13,000,000), subject to certain adjustments. In the event Gordon Brothers were

able to obtain more than approximately $17,000,000 in the liquidation process, a percentage of

any amount over the $17,000,000 threshold (later reduced to $15,000,000) was to be paid to

Ares/ACAS.

<u>NECCO Candy's Board Belatedly Considers its Fiduciary Duties</u>

105.    The Delaware law firm of Young Conaway Stargatt & Taylor, LLP ("**YCST**")

was retained as NECCO Candy's corporate advisory and restructuring counsel in late March

2017.

106.    In October 2017, well *after* the real estate transactions of April 24, 2017, the

Board finally recognized that it should educate itself on the fiduciary duties owed to NECCO

Candy and to creditors. Accordingly, YCST prepared a PowerPoint presentation for discussion

with the NECCO Candy Board of Directors at an October 20, 2017 meeting.  This "preliminary

briefing" included a section entitled "Materials for the Directors of NECCO Holdings, Inc. and

NECCO, Inc. Concerning the Fiduciary Duties of Directors of a Financially Challenged

Corporation." YCST's briefing discussed directors' fiduciary duties under Delaware law; the standards of review for a breach of fiduciary duty; how insolvency impacts the Board's decision-making process and the constituencies to which the Board owes fiduciary duties; and the significance of having directors (such as Katz and Chehi) appearing on both sides of a transaction.

107. YCST was also commissioned to author several legal memoranda relating to potential claims by and against NECCO Candy and ACAS/Ares. One memorandum, titled "NECCO – Equitable Subordination and Recharacterization in Delaware," discusses potential claims against ACAS/Ares and the various factors considered by Delaware courts. Another memorandum evaluated the statute of limitations under Delaware and Massachusetts law for potential claims for (i) fraudulent transfer, (ii) illegal dividend, (iii) breach of fiduciary duty, and (iv) unjust enrichment.

108. On November 7, 2017, Eaton was added to the NECCO Board of Directors as a purportedly "independent" director. Upon information and belief, Eaton is a bankruptcy attorney who retired from a law firm in Chicago.

109. Eaton was solicited by YCST attorney Robert Brady, who described NECCO Candy as a "small manufacturing portfolio company that is going through a sale process/potential chapter 11."

110. Even after Eaton's appointment as an "independent" director, the NECCO Candy Board did not consider (or even bother to inform themselves as to) the company's potential claims and defenses to ACAS's purported security interests and asserted debt, or the potential causes of action belonging to NECCO Candy arising from the April 2017 real estate transactions.

### The Board Colludes With ACAS to File a Sham Receivership Action

111.    On March 21, 2018, ACAS (as lender) filed a Verified Complaint and Motion for Emergency Relief to appoint a Receiver for NECCO Candy in Suffolk Superior Court. ACAS alleged that a receiver needed to be appointed on an emergency basis to seize control over and liquidate all of NECCO Candy's assets.

112.    On March 30, 2018, the Court (Kaplan, J.) denied ACAS's emergency motion, finding that:

> "In this case, ACAS proceeded by means of an emergency motion filed the very same day as the Complaint, apparently without notice to any other creditors.  The moving papers do not explain what the emergency was.  **Indeed, the moving papers did not disclose that ACAS controlled NECCO through stock ownership and majority representation on its Board, a fact which appears to cut against the notion that an emergency existed,** as the debtor corporation would not take actions wasting assets or impairing the interests of the secured creditor, if the property were not placed in the hands of an independent receiver.  The moving papers also did not disclose that another Superior Court judge had issued an attachment on trustee process and reach and apply injunction just days before." (Emphasis added).

113.    Judge Kaplan also noted that ACAS was requesting relief "to aid in maximizing the value of NECCO's assets for its own benefit, rather than to benefit any other creditor or stakeholder in NECCO."

114.    Upon information and belief, the State Court action was orchestrated by Ares/ACAS as a means to avoid scrutiny of its suspect debt and to distract from its misconduct and manipulation of NECCO Candy, including its control of all decisions respecting the April 2017 real estate transactions. The NECCO Candy Board of Directors was complicit in the State Court action, and consented to the appointment of a receiver. In belated recognition of their conflicted status, Katz and Chehi abstained.

28

Case 1:18-cv-11884-WGY   Document 1   Filed 08/31/18   Page 29 of 45

<u>Trade Creditors Throw NECCO Candy into Bankruptcy</u>

115.    On April 3, 2018, three days after Judge Kaplan issued his ruling in State Court, three of NECCO Candy's trade creditors filed an involuntary petition against NECCO Candy in the U.S. Bankruptcy Court for the District of Massachusetts.

116.    At the time of the bankruptcy and as a result of the gross mismanagement, self-dealing, misconduct and delay by both the Board of Directors and Ares/ACAS, NECCO Candy's financial position had substantially deteriorated.  During the preceding year, the ACAS Revolver balance had increased from approximately $16,600,000 to $21,300,000 and NECCO Candy's payables had increased from approximately $8,700,000 to $12,160,000.  NECCO Candy ran up its non-insider debt to over $20,000,000. In the meantime, NECCO Candy's receivables and inventory had decreased from approximately $23,000,000 to $16,000,000.

117.    At all times relevant hereto, NECCO Candy and NECCO Realty were insolvent, engaged in business and transactions with assets which were unreasonably small in relation to such business and transactions, lacked sufficient capital to pay obligations as they came due, and consistently incurred debts beyond their ability to pay.

118.    On April 17, 2018, NECCO Candy filed a motion to convert the case to a Chapter 11 proceeding, along with a motion to sell substantially all of its assets to Gordon Brothers under the same structure that had been proposed prepetition, but at a reduced cash price of approximately $13,000,000.

<u>The Trustee is Appointed and a Transparent Sale Process is Established</u>

119.    On April 19, 2018, the Bankruptcy Court granted a motion to convert the case to Chapter 11, on account of ACAS's blatant conflict of interest in its dual roles as creditor and

owner.   One day later, at the request of the US Trustee and creditors, Harold B. Murphy was appointed as the Trustee for NECCO Candy.

120.   On May 2, 2018, the Trustee filed a Motion to Approve Bidding Procedures, Notice Procedures, and Breakup Fee in Connection with Motion for Order Approving Private Sale of Substantially all Assets Free and Clear of Liens, Encumbrances, and Interests, and (B) to Authorize Trustee to Effectuate Sale Pursuant to Terms of Asset Purchase Agreement as Amended, and (C) for Related Relief.  In essence, the motion sought to market the Debtor's assets and solicit counteroffers to the proposed transaction with Gordon Brothers.

121.   As a result of the Section 363 bankruptcy sale process approved by the Bankruptcy Court and as proposed and implemented by the Chapter 11 Trustee, seven bids for NECCO Candy's product lines and assets were received.  An auction was held amongst the qualifying bidders for substantially all of NECCO Candy's assets on May 23, 2018, at which the high bid submitted was $18,880,000.  The high bidder subsequently alleged that NECCO Candy's assets had been compromised as a result of the failure of NECCO Candy to preserve and maintain the NECCO Real Estate.  As a consequence, the sale to the high-bidder did not close and the Chapter 11 Trustee had to re-sell the assets for a reduced purchase price of $17,330,000, with $1,000,000 of the proceeds now in dispute for the reasons cited by the high-bidder at the auction.

V.    **Claims**

**Count I – Breach of Fiduciary Duties – Cannon Deal**
**(Directors Khanna/O'Brien/Weekes/ Yi/ McGee/Chehi/Katz)**

122.   The Trustee incorporates the allegations of paragraphs 1-121 as if specifically plead herein.

30

Case 1:18-cv-11884-WGY Document 1 Filed 08/31/18 Page 31 of 45

123. As Directors of NECCO Candy, Defendants Khanna, O'Brien, Weekes, Yi, McGee, Chehi, and Katz (together with Eaton, the "**Director Defendants**") owed fiduciary duties of care, loyalty and good faith to NECCO Candy.

124. Certain of the Director Defendants, namely Yi, Khanna, Katz, Chehi, Weekes and McGee, were also Managers of NECCO Realty at various points.

125. As employees of ACAS and Ares, Khanna, O'Brien, Yi, Chehi and Katz, had an inherent conflict of interest in that they were incentivized to produce a transaction that was beneficial to ACAS and Ares but not necessarily to NECCO Candy or its creditors.

126. As set forth above, the Director Defendants consciously disregarded and breached their fiduciary duties to NECCO Candy by (i) sabotaging the Cannon Deal as part of scheme to enrich ACAS and Ares at the expense of NECCO Candy; (ii) allowing ACAS and Ares to wrest control of the proposed Cannon transaction; and (iii) permitting all of the Atlantic purchase price to be diverted to the NECCO Real Estate.

127. In addressing the Cannon offer, the Director Defendants failed to exercise informed, disinterested or independent judgment, and acted for a purpose other than advancing the best interests of NECCO Candy.

128. The obvious and intended effect of the Director Defendants' breach of their fiduciary duties was to deny NECCO Candy the benefit and opportunity presented by Cannon's proposal to relocate the company, pay liabilities and supply necessary working capital, in favor of diverting that consideration to NECCO Realty and its stakeholders. These decisions were not fair to NECCO Candy; indeed, they sentenced NECCO Candy to liquidation.

129. The Director Defendants abdicated their fiduciary responsibilities in connection with a proposed material transaction, deliberately bowing to the directives of ACAS and Ares.

Case 1:18-cv-11884-WGY  Document 1  Filed 08/31/18  Page 32 of 45

They did so with the knowledge that those directives were made in accordance with ACAS's and

Ares's incentive to secure all of the Atlantic consideration for themselves, at NECCO Candy's

expense.

130.    As a result of the Director Defendant's breach of their fiduciary duties, NECCO

Candy and its creditors suffered substantial damages in an amount to be proven at trial.

**Count II – Aiding & Abetting Breach of Fiduciary Duties – Cannon Deal
(ACAS)**

131.    The Trustee incorporates the allegations of paragraphs 1 -130 as if specifically

plead herein.

132.    The Director Defendants owed fiduciary duties of care, loyalty and good faith to

NECCO Candy.

133.    As set forth above, the Director Defendants consciously disregarded and breached

their fiduciary duties to NECCO Candy by (i) sabotaging the Cannon Deal as part of scheme to

enrich ACAS and Ares at the expense of NECCO Candy; (ii) allowing ACAS and Ares to wrest

control of the proposed Cannon transaction; and (iii) permitting all of the Atlantic purchase price

to be diverted to the NECCO Real Estate.

134.    ACAS issued a general directive to its employees on the NECCO Candy Board of

Directors to reject the Cannon Deal as structured and to allocate all proceeds to NECCO Realty

for the ultimate benefit of Ares. ACAS continuously sought to appease Ares until the merger

between ARCC and ACAS was consummated, regardless of any detriment to NECCO Candy.

135.    ACAS knew all of the essential details of and motives behind Ares's mandates to

reject the Cannon Deal and to divert to NECCO Realty all of the consideration the Cannon Deal

would have allocated to relocation and supplying working capital to NECCO Candy.

136.    ACAS knowingly participated in the Director Defendants breach of their fiduciary duties to NECCO Candy

137.    As a result of ACAS's conduct, NECCO and its creditors suffered substantial damages in an amount to be proven at trial.

### Count III – Aiding & Abetting Breach of Fiduciary Duties – Cannon Deal
### (Ares)

138.    The Trustee incorporates the allegations of paragraphs 1-137 as if specifically plead herein.

139.    The Director Defendants owed fiduciary duties of care, loyalty and good faith to NECCO.

140.    As set forth above, the Director Defendants consciously disregarded and breached their fiduciary duties to NECCO Candy by (i) sabotaging the Cannon Deal as part of scheme to enrich ACAS and Ares at the expense of NECCO Candy; (ii) allowing ACAS and Ares to wrest control of the proposed Cannon transaction; and (iii) permitting all of the Atlantic purchase price to be diverted to the NECCO Real Estate.

141.    Ares knowingly participated in the Director Defendants' breach of fiduciary duties by compelling them to relinquish control of the negotiations with Cannon and ultimately instructing the officers and directors of NECCO Candy to reject the Cannon Deal and divert the entire purchase price to the NECCO Realty and ultimately to Ares.

142.    As a result of Ares's conduct, NECCO Candy and its creditors suffered substantial damages in an amount to be proven at trial.

Case 1:18-cv-11884-WGY   Document 1   Filed 08/31/18   Page 34 of 45

**Count IV – Breach of Fiduciary Duties – Termination of Lease/Imposition of New Lease**
**(Katz/Chehi/ Weekes/ McGee)**

143.    Trustee incorporates the allegations of paragraphs 1-142 as if specifically plead herein.

144.    The Director Defendants owed fiduciary duties of care, loyalty and good faith to NECCO Candy.

145.    The Director Defendants authorized and caused NECCO Candy to: (i) terminate the Lease with NECCO Realty, under which NECCO Candy had been operating rent-free for years, and (ii) enter into the New Lease with Atlantic obligating NECCO Candy to pay $5,000,000 in rent that it could not afford and committing NECCO Candy to vacate and restore the premises by August 31, 2018. By taking on these obligations, the Director Defendants destined NECCO Candy to liquidation.

146.    The Director Defendants failed to consider the fairness of the lease transactions as to NECCO Candy. The Director Defendants also failed to secure independent counsel for NECCO Candy until approximately one month prior to the closing with Atlantic, at which point the transaction was all but *fait accompli*.

147.    The Director Defendants authorized and caused the Lease termination and entry into the New Lease without securing any commitment from ACAS or Ares to fund the requisite rent payments or anticipated maintenance, relocation and restoration costs under the New Lease, and without any business plan for NECCO Candy. NECCO Candy did not revive any consideration for its accommodation of ACAS/Ares's transaction with Atlantic.

148.    In authorizing and causing the Lease termination and NECCO Candy's entry into the New Lease with Atlantic, failing to consider the fairness of the transaction as to NECCO Candy, failing to secure financial commitments from ACAS or Ares, and failing to address

34

NECCO Candy's business requirements going forward, the Director Defendants intentionally acted with a purpose other than advancing NECCO Candy's best interests.

149.    In authorizing and causing the Lease termination and entry into the New Lease, the Director Defendants acted solely at the behest of ACAS and Ares, without exercising informed or independent judgment.

150.    The Director Defendants flagrantly and deliberately breached their fiduciary duties to NECCO Candy by authorizing and causing NECCO Candy to terminate the NECCO Realty Lease and entering into the New Lease at the directive of ACAS and Ares.

151.    As a result of the Director Defendants breach of their fiduciary duties, NECCO Candy and its creditors suffered substantial damages in an amount to be proven at trial.

### Count V – Aiding & Abetting Breach of Fiduciary Duties - Termination of Lease/Imposition of New Lease
### (ACAS)

152.    The Trustee incorporates the allegations of paragraphs 1-151 as if specifically plead herein.

153.    The Director Defendants owed fiduciary duties of care, loyalty and good faith to NECCO Candy.

154.    As set forth above, the Director Defendants breached their fiduciary duties to NECCO Candy by authorizing and causing NECCO Candy to: (i) terminate the Lease with NECCO Realty, under which NECCO Candy had been operating rent-free for years, and (ii) enter into the New Lease with Atlantic obligating NECCO Candy to pay $5,000,000 in rent that it could not afford and committing NECCO Candy to vacate and restore the premises by August 31, 2018.

35

155. ACAS knowingly participated in the Director Defendants' breach of fiduciary duties.

156. As a result of ACAS's conduct, NECCO Candy and its creditors suffered substantial damages in an amount to be proven at trial.

### Count VI – Aiding & Abetting Breach of Fiduciary Duties - Termination of Lease/Imposition of New Lease
### (Ares)

157. The Trustee incorporates the allegations of paragraphs 1-156 as if specifically plead herein.

158. The Director Defendants owed fiduciary duties of care, loyalty and good faith to NECCO.

159. As set forth above, the Director Defendants breached their fiduciary duties to NECCO Candy by authorizing and causing NECCO Candy to: (i) terminate the Lease with NECCO Realty, under which NECCO Candy had been operating rent-free for years, and (ii) enter into the New Lease with Atlantic obligating NECCO Candy to pay $5,000,000 in rent that it could not afford and committing NECCO Candy to vacate and restore the premises by August 31, 2018.

160. At the time the Director Defendants authorized and caused NECCO Candy to terminate the Lease and enter into the New Lease, two of the Director Defendants were Ares employees, one was the CEO serving under Ares's direction and control, and all of the Director Defendants served at Ares's pleasure in that Ares ultimately controlled the membership of the NECCO Candy Board of Directors.

161. Ares orchestrated the Director Defendants actions in terminating the Lease and effectuating the transaction with Atlantic. Upon information and belief, Ares or its counsel

36

prepared the Board resolutions authorizing termination of the Lease and entry into the New Lease with Atlantic, and instructed McGee to sign the Termination of Memorandum of Lease for both the Landlord (NECCO Realty) and Tenant (NECCO Candy).

162.    Ares rewarded McGee for doing Ares's bidding by consenting to the amendment of the 2012 SAR Plan to permit receipt of the Real Estate Incentives prior to and in the absence of any triggering change of control transaction at NECCO Candy, resulting in aggregate payments to McGee in excess of $1,200,000.

163.    Ares knowingly participated in the Director Defendants' breach of fiduciary duties.

164.    As a result of Ares's conduct, NECCO Candy and its creditors suffered substantial damages in an amount to be proven at trial.

**Count VII – Breach of Fiduciary Duties - Signing Lease Termination as CEO of Both NECCO Realty MA I & NECCO Candy and Signing New Lease (McGee)**

165.    The Trustee incorporates the allegations of paragraphs 1-164 as if specifically plead herein.

166.    As a director and officer of NECCO Candy, McGee owed NECCO Candy fiduciary duties of care, loyalty and good faith.

167.    McGee served as the Chief Executive Officer of NECCO Candy at the pleasure of ACAS and Ares, who owned and controlled the majority of equity interests in NECCO Candy's parent company, NECCO Holdings, and who controlled the votes of the majority of the Boards of Directors of both NECCO Candy and NECCO Holdings. Ares also controlled the Board of Managers of NECCO Realty, on which McGee served.

37

168.     By signing the Termination of Memorandum of Lease for both the Landlord (NECCO Realty) and the Tenant (NECCO Candy), McGee terminated the Lease under which NECCO Candy had continuously operated without paying rent since 2011.

169.     McGee caused NECCO Candy to terminate its Lease and sign the New Lease with the knowledge that NECCO Candy could not afford to pay rent, and without securing any binding commitment from ACAS or Ares to fund rent payments or anticipated relocation and restoration costs under the New Lease or to assist NECCO Candy in securing new premises at the end of the New Lease term.

170.     McGee caused NECCO Candy to terminate its Lease without securing anything of value in return for what NECCO Candy gave up as a result of the termination, or any opinions on the fairness of the transaction as to NECCO Candy.

171.     McGee caused NECCO Candy to terminate its Lease on terms so one-sided that no business person of ordinary, sound judgment could conclude that NECCO Candy had received adequate consideration.

172.     McGee terminated NECCO Candy's Lease and signed the New Lease solely at the behest of ACAS and Ares and with a purpose other than advancing NECCO Candy's best interests.

173.     McGee's actions in causing termination of NECCO Candy's Lease and signing the New Lease demonstrated conscious disregard for his fiduciary duties to NECCO Candy, and were not undertaken in good faith.

174.      McGee breached his fiduciary duties to NECCO Candy by signing the Termination of Memorandum of Lease and the New Lease.

38

175.    As a result of McGee's breach of his fiduciary duties, NECCO Candy and its creditors suffered substantial damages in an amount to be proven at trial.

### COUNT VIII- BREACH OF FIDUCIARY DUTIES – MISCONDUCT IN CONNECTION WITH LIQUIDATING NECCO CANDY'S ASSETS
### (MCGEE, KATZ, CHEHI, EATON, WEEKES)

176.    The Trustee incorporates the allegations of paragraphs 1-175 as if specifically plead herein.

177.    The Director Defendants owed NECCO Candy fiduciary duties of care, loyalty and good faith.

178.    Effective January 1, 2017, Director Defendants McGee, Weekes, Chehi, and Katz were also members of the Board of Managers of NECCO Realty.

179.    While NECCO Candy was insolvent, the Director Defendants allowed the value of NECCO Candy's assets to diminish and the amount of its liabilities to increase, without taking any mitigating actions until after NECCO Realty and its ultimate stakeholders, ACAS and Ares, had consummated a sale of the NECCO Real Estate on terms detrimental to NECCO Candy.

180.    Following consummation of the Atlantic Deal, when the Term Loan secured debt position of ACAS was susceptible to avoidance, the Director Defendants failed to take any steps necessary to analyze or address the resultant value implications for NECCO Candy, opting instead to stand idly by while the statute of limitations on ACAS's preference liability continued to run.

181.    The Director Defendants failed to take the necessary steps to fund the preservation, maintenance and repair of the NECCO Real Estate, thereby inviting inquiry by governmental agencies and exposure and expense for NECCO Candy.

39

Case 1:18-cv-11884-WGY   Document 1   Filed 08/31/18   Page 40 of 45

182.     The Director Defendants were also complicit in the efforts of ACAS and Ares to convince a Massachusetts Superior Court judge to appoint a receiver on an emergency basis, without notifying any of NECCO Candy's other creditors and without disclosing ACAS's controlling equity position (among other things), all with the purpose of avoiding any scrutiny of or challenge to the sale of the NECCO Real Estate to Atlantic, the termination of the Lease, the entry into the New Lease, and the potential causes of action held by NECCO Candy or its creditors.

183.     Following the involuntary bankruptcy filing and conversion to Chapter 11, the Director Defendants blindly adopted the terms of sale negotiated between Gordon Brothers and Ares prepetition as the last best hope without adequately investigating the alternative potential to secure higher and better offers within the Chapter 11 framework.

184.     Each of the above actions and omissions constituted a breach of the Director Defendants' fiduciary duties to NECCO Candy, in conscious disregard of the attendant risks to NECCO Candy and its creditors as a result of material corporate decisions, which they made while under the influence and control of ACAS and Ares, and in the interest of ACAS and Ares but to the detriment of NECCO Candy and its creditors.

185.     As a result of the Director Defendants breach of their fiduciary duties, NECCO Candy and its creditors suffered substantial damages.

### Count IX – Aiding & Abetting Breach of Fiduciary Duties – Misconduct in Connection with LIQUIDATING NECCO CANDY'S ASSETS
### (ACAS)

186.     The Trustee incorporates the allegations of paragraphs 1-185 as if specifically plead herein.

40

187.    The Director Defendants owed fiduciary duties of care, loyalty and good faith to NECCO Candy.

188.    As set forth above, the Director Defendants breached their fiduciary duties to NECCO Candy by, among other things, (i) failing to timely pursue an orderly liquidation and wind-down of its affairs; (ii) allowing the value of NECCO's assets to diminish without taking any mitigating action during the months required to consummate a sale of real estate assets belonging to NECCO Realty, to the benefit of ACAS and Ares and on terms detrimental to NECCO Candy; (iii) causing the amount of NECCO Candy's payables to dramatically increase in the same time period; (iv)  acquiescing to the ACAS/Ares "emergency" motion to install a receiver, with the knowledge that the receivership route was selected in order to avoid scrutiny of or challenges to the sale of the NECCO Real Estate and NECCO Candy's New Lease with Atlantic and other misconduct; (v) failing to consider and act on potential causes of action belonging to NECCO Candy; (vi) failing to provide necessary funding to preserve, maintain and repair the NECCO Realty; and (vii) seeking to accomplish expedited consummation of the sale of substantially all NECCO Candy's assets to Gordon Brothers, on the terms negotiated prepetition, without considering or allowing for the potential to secure higher and better offers within the Chapter 11 framework.

189.    With respect to each of the above, ACAS directed the Director Defendants' actions and urged them on at every step, discouraging exploration of any wind-down or sale transaction for NECCO Candy until a sale of the NECCO Real Estate to Atlantic had been consummated, repeatedly dragging its feet in approving and disbursing funds NECCO Candy requested in order to pay its counsel, causing the amount of NECCO Candy's payables to dramatically increase, seeking the "emergency" appointment of a receiver in state court rather

41

Case 1:18-cv-11884-WGY Document 1 Filed 08/31/18 Page 42 of 45

than bless any bankruptcy filing by NECCO Candy that might make the terms of the New Lease

vulnerable to avoidance risk and even invoke scrutiny of the terms of the larger Atlantic Deal,

and convincing the Director Defendants that they could not accomplish any transaction on better

terms than the deal negotiated with Gordon Brothers prepetition.

190. ACAS's actions amount to knowing participation in the Director Defendants'

breaches of fiduciary duties.

191. As a result of ACAS's conduct, NECCO and its creditors suffered substantial

damages in a mount to be proven at trial.

**Count X – Aiding & Abetting Breach of Fiduciary Duties – Misconduct in Connection with**
**LIQUIDATING NECCO CANDY 'S ASSETS**
**(ARES)**

192. The Trustee incorporates the allegations of paragraphs 1-191 as if specifically

plead herein.

193. The Director Defendants owed fiduciary duties of care, loyalty and good faith to

NECCO Candy.

194. As set forth above, the Director Defendants breached their fiduciary duties to

NECCO Candy by, among other things, (i) failing to timely pursue an orderly liquidation and

wind-down of its affairs; (ii) allowing the value of NECCO's assets to diminish without taking

any mitigating action during the months required to consummate a sale of real estate assets

belonging to NECCO Realty, to the benefit of ACAS and Ares and on terms detrimental to

NECCO Candy; (iii) causing the amount of NECCO Candy's payables to dramatically increase

in the same time period; (iv) acquiescing to the ACAS/Ares "emergency" motion to install a

receiver, with the knowledge that the receivership route was selected in order to avoid scrutiny of

or challenges to the sale of the NECCO Real Estate and NECCO Candy's New Lease with

42

Atlantic and other misconduct; (v) failing to consider and act on potential causes of action belonging to NECCO Candy; (vi) failing to provide necessary funding to preserve, maintain and repair the NECCO Realty; and (vii) seeking to accomplish expedited consummation of the sale of substantially all NECCO Candy's assets to Gordon Brothers, on the terms negotiated prepetition, without considering or allowing for the potential to secure higher and better offers within the Chapter 11 framework.

195.    With respect to each of the above, Ares directed the Director Defendants' actions and urged them on at every step, discouraging exploration of any wind-down or sale transaction for NECCO Candy until a sale of the NECCO Real Estate to Atlantic had been consummated, repeatedly dragging its feet in approving and disbursing funds NECCO Candy requested in order to pay its counsel, causing the amount of NECCO Candy's payables to dramatically increase, seeking the "emergency" appointment of a receiver in state court rather than bless any bankruptcy filing by NECCO Candy that might make the terms of the New Lease vulnerable to avoidance risk and even invoke scrutiny of the terms of the larger Atlantic Deal, and convincing the Director Defendants that they could not accomplish any transaction on better terms than the deal negotiated with Gordon Brothers prepetition.

196.    Ares actions amount to knowing participation in the Director Defendants' breaches of fiduciary duties.

197.    As a result of ACAS's conduct, NECCO and its creditors suffered substantial damages in an amount to be proven at trial.

WHEREFORE, the Trustee respectfully requests that the Court enter judgment:

Case 1:18-cv-11884-WGY Document 1 Filed 08/31/18 Page 44 of 45

1. Finding that the Director Defendants breached their fiduciary duties to NECCO Candy;

2. Finding that ACAS aided and abetted the Director Defendants' breach of their fiduciary duties to NECCO Candy;

3. Finding that Ares aided and abetted the Director Defendants' breach of their fiduciary duties to NECCO Candy;

4. Awarding damages to the Plaintiff for the benefit of the NECCO Candy bankruptcy estate in an amount proven at trial; and

5. Awarding such other relief as may be just and proper.

**Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all claims so triable of right.

Respectfully submitted,

HAROLD B. MURPHY,
CHAPTER 11 TRUSTEE

By his attorneys,

/s/ David L. Evans
Charles R. Bennett (BBO# 037380)
David L. Evans (BBO# 156695)
Andrea L. MacIver (BBO# 569280)
Christopher M. Condon (BBO# 652430)
MURPHY & KING
Professional Corporation
One Beacon Street
Boston, Massachusetts 02108
Tel: (617) 423-0400
Email: cbennett@murphyking.com
        devans@murphyking.com
        amaciver@murphyking.com
        ccondon@murphyking.com

Dated: August 31, 2018

44

Case 1:18-cv-11884-WGY Document 1 Filed 08/31/18 Page 45 of 45

#747412

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Harold B. Murphy, Chapter 11 Trustee of
New England Confectionery Company, Inc.

**DEFENDANTS**
ACAS, LLC; Ares Capital Corporation; Ares Management L.P., Ares Capital Management LLC; Ares Management LLC; Michael McGee; Myung Yi; Anuj Khanna; Gordon O'Brien; Stephen Chehi; Daniel Katz; Douglas Weekes; and David Eaton

**(b)** County of Residence of First Listed Plaintiff    Suffolk
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David L. Evans, Charles R. Bennett, Murphy & King P.C.
One Beacon Street, Boston MA 02108-3107 (tel.) 617-423-0400

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☒ 3   Federal Question *(U.S. Government Not a Party)* 28 U.S.C. §1334(b) |
| ☐ 2   U.S. Government Defendant | ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*      Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1334(b)
Brief description of cause:
Breach of Fiduciary Duties, Aiding and Abetting Breach of Fiduciary Duties

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes    ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE      DOCKET NUMBER

DATE
08/31/2018
SIGNATURE OF ATTORNEY OF RECORD
David L. Evans

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** Murphy v. ACAS, LLC et al.

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).**

   ☐    I.    **410, 441, 470, 535, 830\*, 835\*, 891, 893, 895, R.23, REGARDLESS OF NATURE OF SUIT.**

   ☑    II.    **110, 130, 140, 160, 190, 196, 230, 240, 290,320,362, 370, 371, 380, 430, 440, 442, 443, 445, 446, 448, 710, 720, 740, 790, 820\*, 840\*,  850, 870,  871.**

   ☐    III.    **120, 150, 151, 152, 153, 195, 210, 220, 245, 310, 315,  330, 340, 345, 350, 355, 360, 365, 367, 368, 375, 376, 385, 400, 422, 423, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555,  625, 690, 751, 791, 861-865,  890, 896, 899, 950.**

   **\*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.**

3. **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

   YES ☐        NO ☑

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?    (See 28 USC §2403)**

   YES ☐        NO ☑

   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

   YES ☐        NO ☐

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

   YES ☐        NO ☑

7. **Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).**

   YES ☑        NO ☐

   A.    **If yes, in which division do all of the non-governmental parties reside?**

   **Eastern Division** ☐        **Central Division** ☐        **Western Division** ☐

   B.    **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

   **Eastern Division** ☐        **Central Division** ☐        **Western Division** ☐

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)**

   YES ☐        NO ☐

**(PLEASE TYPE OR PRINT)**

**ATTORNEY'S NAME** Charles R. Bennett

**ADDRESS** Murphy & King, P.C., One Beacon Street, 21st Floor, Boston, MA 02108-3107

**TELEPHONE NO.** 617-423-0400

**(CategoryForm6-2017.wpd )**